**Affirmed in Part; Reversed and Remanded in Part; and Opinion filed May 8, 2012.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-11-00019-CR
## NO. 14-11-00020-CR

_____

## ERIC DEWAYNE WATTS, Appellant

### V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the County Criminal Court at Law No. 15
Harris County, Texas
Trial Court Cause Nos. 1666129 and 1693626**

---

## OPINION

Appellant Eric Dewayne Watts was convicted in two separate cause numbers: the first, for acting as a guard company without a license; and the second, for unlawfully carrying a weapon. *See* Tex. Occup. Code § 1702.102 (West 2012); Tex. Penal Code § 46.02 (West 2012). Punishment was assessed at three days' confinement, forfeiture of the weapon, and a fine of one thousand dollars per count. In three issues, appellant argues

that the trial court erred by allowing the prosecutor to engage in improper jury argument, by unreasonably restricting the scope of cross-examination, and by refusing to include a voluntariness instruction. We affirm on the first count and reverse and remand on the second.

## BACKGROUND

Appellant dreamt of becoming a police officer. He graduated from the academy, completed over seven hundred hours of professional training, and passed his certification exam with high marks. Despite these many accomplishments, appellant never received his commission. To be commissioned, he still needed to obtain employment with a licensed law enforcement agency.

Appellant applied for a position with several police departments, including the office of Harris County Constable, Precinct Four. The application to Precinct Four requires disclosure of extensive background and character information. Employment history must be detailed and personal references must be provided. In his application, appellant indicated that he was currently employed by LIFECO Security Agency. He denoted his position with that company as "Manager," whose primary duty was "making sure all officers are in compliance." He named Captain Kenneth Hollands as his immediate supervisor.

Corporal Todd Black of Precinct Four was assigned the task of verifying appellant's background information. After diligent research, Corporal Black was unable to locate LIFECO in records maintained by the Department of Public Safety. Corporal Black made repeated attempts to contact Kenneth Hollands, but his calls went unanswered and his messages unreturned. Given the circumstances, Corporal Black began to doubt whether LIFECO even existed.

Other suspicions mounted when Corporal Black began reviewing appellant's personal references. As part of the application process, each reference is required to submit

a confidential questionnaire to Precinct Four. Kimberly Mims Reissig, the manager of appellant's apartment complex, returned a questionnaire on appellant's behalf. In her answers, Reissig identified appellant as a "courtesy officer" responsible for patrolling the apartment and handling domestic disputes and disturbances. Corporal Black was concerned by this description because a courtesy officer is normally a secondary occupation filled by a commissioned peace officer. Corporal Black contacted Reissig to investigate appellant's relationship with the apartment complex. Reissig told him that appellant "works for us" and "he responds to calls out here and all of that." She also informed Corporal Black that appellant has a uniform and occasionally wears a badge. Corporal Black reported this conduct to DPS, believing that appellant may be committing a crime.

DPS appointed Troopers Kyle Crain and Darwin Hunt to investigate appellant's activities. Both are investigators in the Regulatory Crime Bureau, a division tasked with enforcing and regulating the private security industry. This industry includes various occupations, including locksmiths, private investigators, alarm companies, and guard companies. A guard company provides services similar to that of a security guard, such as preventing trespass or unauthorized activity on private property; protecting individuals from bodily harm; and regulating the movement of the public, whether by vehicle or otherwise. *See* Tex. Occup. Code § 1702.108. To operate as a guard company, an individual must hold a security services contractor license. *Id.* § 1702.102. Trooper Crain researched appellant and LIFECO in the DPS database and found that neither was recorded as having a license.

In March 2010, Troopers Crain and Hunt traveled to appellant's apartment complex for a meeting with Reissig. When they arrived, appellant's car was parked in front near the management office. The troopers witnessed appellant leaving the main office wearing plain black plants, a black polo shirt, and a gold badge around his neck. The badge read "Texas Peace Officer," but it was not issued by an authorized agency. Trooper Hunt

engaged appellant before he could leave in his vehicle, while Trooper Crain activated a hidden video recorder in his shirt. A discussion followed, with all three men standing outside appellant's vehicle. When the troopers asked why appellant was wearing a badge, appellant stated that he felt permitted to do so because he had graduated from the academy and passed his state exam. Trooper Hunt expressed concern that appellant was displaying a badge even though he was not yet a certified peace officer. Appellant later removed it.

Appellant described himself to the troopers as a courtesy officer for the apartment complex. He denied working in any capacity as a security guard. He stated that when problems arose, the Houston Police Department was always called. Appellant indicated that he patrolled the property, responded to domestic disturbances, and handled calls for loud noises. In exchange for these services, Reissig supplied him with an apartment and a garage space free of charge.

When the troopers questioned appellant about LIFECO, his answers became more evasive. Appellant first stated that he used to work for LIFECO. Later in the interview, he indicated that LIFECO was not an actual security company, and that it was "just something I put on my application."

During these exchanges, Trooper Crain observed a semiautomatic handgun lying in the passenger seat of appellant's vehicle. The weapon was in its holster and partially covered by a backpack. Appellant revealed that he kept the weapon for his own protection, but he denied carrying it in public or while on patrol.

Appellant was subsequently charged by information with violating the Private Security Act and with unlawfully carrying a handgun. Before proceeding to trial, appellant moved to suppress the statements captured from the hidden video recorder. Appellant argued that his statements were involuntary "because of compulsion and persuasion exerted on him by the police." The trial court denied the motion.

At trial, the State presented evidence that appellant performed the activities of a guard company by issuing citations to apartment residents. One resident, Monica Joiner, testified that appellant flagged her down as she attempted to exit the apartment complex in her car. At the time, appellant was dressed in civilian clothes and was not wearing his badge. Appellant identified himself as a courtesy officer and issued Joiner a citation for exceeding the posted speed limit of ten miles per hour. Joiner testified that she was instructed to return the citation to the management office or risk incurring a fine.

Joiner encountered appellant on a later occasion as appellant was patrolling the property. She approached appellant hoping that he might offer some advice to her friend, who happened to be involved in a contentious domestic dispute. Appellant handed her a business card, which read "LIFECO Security Agency." The card listed appellant's title as "Chief," with license number F-08764. Appellant instructed Joiner's friend that he could be reached at the given number if any problems arose. Joiner testified that appellant also mentioned, "We've just arrested someone earlier today for [a] domestic dispute."

Annissa Toussaint, another resident, identified appellant as the apartment's security officer. Toussaint testified that appellant responded to a call placed by her neighbor complaining of an argument between Toussaint and her boyfriend. Toussaint claimed that appellant arrived at her apartment wearing a badge around his neck. She also testified that appellant issued her a citation for causing a public disturbance.

Crystal Golden did not reside at appellant's apartment, but she knew that appellant provided security for the complex. Golden testified that she frequented the complex to visit her boyfriend. On one occasion, appellant pulled her over in his own vehicle, which was equipped with flashing blue and orange dashboard lights. He then issued her a citation for speeding. At the time of the encounter, Golden testified that appellant was wearing a badge and all black clothing. According to her, appellant also stated that her car would be towed if she did not return the citation to the management office within twenty-four hours.

5

Reissig testified that appellant was her courtesy officer, but because of the apartment's strained financial situation, he was not paid like a traditional employee. Appellant never completed a W-2 form, and in lieu of a paycheck, he was compensated with a free apartment and garage. Reissig testified that she expected appellant to call the police when situations escalated out of control, to assist her with eviction notices, and to check the lights and locks around the property. If incidents occurred after hours or outside her presence, appellant would document them in a "Security Incident/Patrol Report." On the report, appellant would identify himself as "Officer Eric Watts." Reissig clarified that appellant was not a "security" officer, however, because that would wrongly suggest that his role was to protect the residents.

Trooper Larry Shimek provided additional testimony regarding the Private Security Act and appellant's credentials. Trooper Shimek indicated that a security services contractor license is necessary to act as a guard company, with certain limited exceptions. Commissioned peace officers would not require a license to provide the same services performed by appellant, nor would persons regularly and exclusively employed by the apartment complex. *Id.* §§ 1702.322–.323. According to Trooper Shimek, appellant would not qualify under this second exception because he was not an apartment employee.

Trooper Shimek testified that appellant needed to submit an application and pass a separate examination before he could engage in a regulated service. An application was already on file with DPS, Shimek said, but it was associated with a different company called Initial Security. Appellant had listed Initial Security on his resume when he applied to Precinct Four. The resume showed that appellant was a security officer there between 2000 and 2001. Trooper Shimek testified that, based on his research, appellant was only with Initial Security for approximately one month in 2004. The application was eventually abandoned when the appropriate documentation was never submitted.

Trooper Shimek also testified that appellant was assigned a "Z number" when he applied for licensing with DPS. This number is used for internal tracking purposes; if

supplemental materials are later received, DPS can file them according to that number, which ensures that all documents remain together when the application is finally processed. Trooper Shimek testified that appellant's Z number was 8764, which corresponded with the same numbers appearing on the business card appellant distributed to apartment residents. By designating the number with the prefix "F," rather than "Z," Trooper Shimek stated that appellant was representing an identification associated with a training school. Even in such cases, the number does not signify that the carrier holds a license.

The defense called Lieutenant Kenneth Key as its only witness. At the time of trial, Lieutenant Key had been a licensed peace officer for sixteen years. He was working at Precinct Four, and he had also served as a courtesy officer at appellant's apartment complex. Lieutenant Key testified that he only ever saw appellant walking the property, changing light bulbs, and reporting issues to maintenance. He claimed that he never observed appellant wearing a badge or carrying a gun while working as a courtesy officer. Lieutenant Key also testified that appellant was "very eager to get involved in law [enforcement]." To assist in that endeavor, Lieutenant Key served as a personal reference in connection with appellant's application to Precinct Four.

Defense counsel's closing statement focused largely on the subject of intent. Counsel reminded the jury that before a conviction could be had, the State needed to prove beyond a reasonable doubt that appellant acted intentionally or knowingly with respect to his conduct. Counsel argued that appellant lacked this requisite mental state because the evidence demonstrated that appellant had invested considerable time and effort towards receiving his commission. As counsel put it, "Mr. Watts would never, never have done anything to jeopardize fulfilling his dream of becoming a peace officer. He would never have done something to put that at risk." Counsel also stated that because Corporal Black had recommended that appellant be permanently rejected from Precinct Four, "it will not be easy for Mr. Watts to come back from this." But, he cautioned, "This is not a

7

referendum on should Mr. Watts be a peace officer, in other words. I don't want that to be a distraction."

The prosecutor responded with the following argument:

> You have got to be wondering by now. Why in the world would we drag six people down here, prosecute a guy that teaches bible study? What is so important about this Private Security Act in this case that makes us want to spend three days hammering out all of this evidence? I'm going to tell you. Because this defendant is extremely excited about starting a career as a law enforcement agent.
>
> You heard Lieutenant Keys [sic] get up here and in 24 minutes, four times he stated how excited this defendant is to become a police officer. And what we have in this investigation is a series of lies, exceeding his authority. And do you want a police officer who lies?

Defense counsel promptly objected, arguing that "the prosecutor is encouraging the jury to find the defendant guilty so he will not become a police officer." The trial court overruled the objection. The prosecutor resumed:

> Do you want a police officer who exceeds his authority? Do you want that kind of an officer on the street? Worse yet, in the not too distant future, [the assistant district attorney] and I are going to be trying another case. Maybe in this courtroom, maybe in another one. There, the defendant is not going to be a bible study teacher. He's not going to be a guy who I honestly believe wanted to help people. I believe that about this guy. I believe Eric Watts truly wanted to help people.
>
> But you saw [defense counsel] take the DPS troopers with 16 years experience on cross-examination. Now, [defense counsel], outside of trial, is a friend, he's a longtime prosecutor here. He is an extremely smart and able attorney. You saw him for hours trying to make these guys look bad. For hours.
>
> \*\*\*
>
> I want you to imagine in the not too distant future an Officer Watts, somebody I'm going to have to put on the stand, and a very able, intelligent defense attorney is going to cross-examine him. He's going to say, wait a

8

minute. Isn't it true that you have a history of lying? You even lied on your application to Constable Precinct 4.

Defense counsel renewed his objection, stating that this argument was "far outside the record." The objection was overruled, and the prosecutor continued:

> You lied about the existence of LIFECO Security Agency. You said you have experience there. That was never a security agency. You lied about the time that you spent working for another security agency. You said you worked there for a year and a half. These records from DPS say you worked there, at the most, one month.

> When you were working security unlicensed, you were handing out this business card. You changed your Z number to an F number to make people think you had a license to do what you were doing. You're a liar. That's what a defense attorney is going to do.

> [The assistant district attorney] and I are going to have to sit here and we're going to have to take it because it's true. Defense attorney is going to say, this officer exceeded his authority on this time.

Defense counsel objected once more, contending that "this argument is based on a hypothetical of Mr. Watts becoming a police officer and testifying in court." The trial court overruled the objection. The argument carried on as follows:

> You used to give citations before you were a commissioned police officer. You were working security, you were an unlicensed police officer. You were committing a crime when you did that.

> [The assistant district attorney] and I are going to have to sit there, and we're going to have to take it. The defendant in that case is going to be a real bad guy. In that case, he's going to be a man who beats his wife until she is purple.

Defense counsel objected again, pleading with the trial court to "confine this to the evidence and the facts and the law in this case." The objection was sustained and no further relief was requested. The prosecutor proceeded:

> In the future we could try a case with a real bad guy, and we can't have officers that have a history of lying, exceeding their authority. That is

9

why this case is important. Our criminal justice system relies on the integrity of our officers on our street, because without that, bad guys walk away. That is why we're here.

*** 

I want him to go home. But I want him to go home knowing that he is not going to be able to be that police officer. Because I can't ever put him on the stand. If he catches a bad guy, I have to let that one go.

The argument continued with a discussion of appellant's intent, without any further objection being made to the preceding statements.

## IMPROPER JURY ARGUMENT

In his first issue, appellant contends that the trial court erred by overruling his objections to the prosecutor's improper argument.

To fall within the realm of proper jury argument, the argument must generally encompass one of the following categories: (1) a summation of the evidence; (2) a reasonable deduction from the evidence; (3) an answer to argument of opposing counsel; or (4) a plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). Argument exceeding these bounds is improper, and the trial court commits error when it (1) fails to overrule objections to such argument; (2) refuses an instruction to disregard after sustaining an objection to the argument; or (3) fails to grant a mistrial necessitated because of the argument. *See Koller v. State*, 518 S.W.2d 373, 375 (Tex. Crim. App. 1975); *Faulkner v. State*, 940 S.W.2d 308, 314 (Tex. App.—Fort Worth 1997, pet. ref'd).

Appellant's brief complains of the State's closing argument as a whole, but we believe that only some of the prosecutor's statements were improper. We address both the proper and the improper portions.

The prosecutor's closing statement began with an explanation of appellant's charges. The prosecutor indicated that this case was important because appellant was

applying to be a police officer, and the evidence showed that he had lied and abused his authority. In our view, arguments such as "[D]o you want a police officer who lies?" and "Do you want a police officer who exceeds his authority?" can be interpreted as proper pleas for law enforcement.

Pleas for law enforcement may take many forms. These include arguments that draw on the relationship between the jury's verdict and the deterrence of crime in general, as well as arguments that emphasize the impact of the jury's verdict on the community at large. *Borjan v. State*, 787 S.W.2d 53, 55–56 (Tex. Crim. App. 1990) (per curiam). The argument in this case referred, in general terms, to probative evidence that appellant had misrepresented certain facts and that he had acted as a guard company without license or authorization. The State has a legitimate interest in deterring acts of deception and other abuses of authority. The prosecutor's statements could be construed as an argument that the jury should suppress such conduct because those acts should be committed by no one, regardless of whether the person is a commissioned peace officer or a citizen waiting to join the force.

The prosecutor may refer to the impact of a verdict and the message it sends to the community. *See Harris v. State*, 122 S.W.3d 871, 888 (Tex. App.—Fort Worth 2003, pet. ref'd) ("An argument constitutes a proper plea for law enforcement if it urges the jury to be the voice of the community, rather than asking the jury to lend its ear to the community."); *e.g.*, *Haggerty v. State*, No. 06-06-00022-CR, 2007 WL 426234, at *1 (Tex. App.—Texarkana Feb. 9, 2007, pet. dism'd) (mem. op., not designated for publication) (holding prosecutor made a plea for law enforcement with rhetorical question of "What kind of community do you want to live in?"). The prosecutor's statements here merely reminded the jury of the effect of its verdict and, in particular, the message it conveyed to those charged with maintaining the peace. *Cf. Bowman v. State*, 446 S.W.2d 320, 320–21 (Tex. Crim. App. 1969) (construing as plea for law enforcement statement that "If you acquit this defendant, if you want others to know it, you will be opening the door to rape in

11

Tom Green County, Texas. This verdict is no stronger than the weakest heart on this jury"); *Owens v. State*, 323 S.W.2d 260, 260–61 (Tex. Crim. App. 1959) (reaching same conclusion for closing argument stating "If you acquit this defendant, you want others to learn about this case, you are opening the door to murder in Harris County"). Because the prosecutor's argument implied nothing further, we perceive nothing improper about these closing statements.

The prosecutor then proceeded with statements that invited the jury to "imagine" a scenario in which appellant is acquitted and eventually commissioned as a police officer. The prosecutor argued that such a result was intolerable because appellant would not be a credible witness should he ever be asked to testify against an accused criminal. In those cases, the prosecutor lamented that he would "have to sit here and . . . take it," referring to a hypothetical cross-examination of damaging proportions. The prosecutor also cautioned that, in other cases, he may be forced to let "bad guys walk away" without ever being tried.

Appellant insists that these remarks were improper because they encouraged the jury to convict him on facts not in evidence. The State contends in its brief that these statements were "invited" by defense counsel's argument that appellant would "never have done anything to jeopardize fulfilling his dream of becoming a peace officer." The State appears to be relying upon the invited argument rule.

Under the invited argument rule, "[a] defendant cannot complain of improper prosecutorial argument if he invited the argument." *Ripkowski v. State*, 61 S.W.3d 378, 393 (Tex. Crim. App. 2001). "[I]f the defendant's counsel goes outside the record in his argument, the prosecutor is then also permitted to go outside the record to respond." *Reynolds v. State*, 505 S.W.2d 265, 266 (Tex. Crim. App. 1974). The prosecutor may not, however, stray beyond the scope of the invitation. *Drew v. State*, 76 S.W.3d 436, 463 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd).

We cannot say that defense counsel ever argued outside the record in this case. The record contained probative evidence that appellant had taken many steps towards

becoming a police officer: he graduated from the police academy, completed many hours worth of training, and passed a certification exam. Relying on that evidence, defense counsel argued that appellant could not have acted intentionally or knowingly because appellant knew that engaging in proscribed activity would undermine his career prospects. This argument was proper, as trial counsel has always been afforded wide latitude in drawing reasonable inferences from the evidence. *See Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988).

The prosecutor's response did not concentrate on the subject of appellant's intent, nor did it attempt to draw a reasonable inference from the evidence. Instead, it focused on some speculative fear that appellant might face rigorous cross-examination should he ever be called to testify in a hypothetical trial. The implication of this argument was that the prosecutor would face difficulties in future trials because appellant, when testifying as an officer on behalf of the State, would not be perceived as a credible witness.

The State's burdens in future cases was not a relevant or appropriate matter for the jury to consider during appellant's prosecution. The prosecutor's argument was far outside the record and clearly improper. *See Berryhill v. State*, 501 S.W.2d 86, 87 (Tex. Crim. App. 1973) ("Argument injecting matters not in the record is clearly improper . . . ."). It was error for the trial court not to sustain appellant's objections.

Even when argument is improper, it will not result in reversal unless, in light of the record as a whole, it is extreme or manifestly improper, violative of a mandatory statute, or injects new facts harmful to the accused into the trial proceeding. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000); *Todd v. State*, 598 S.W.2d 286, 297 (Tex. Crim. App. [Panel Op.] 1980). For reversal to be warranted, the remarks must have constituted a willful and calculated effort to deprive appellant of a fair and impartial trial. *Cantu v. State*, 939 S.W.2d 627, 633 (Tex. Crim. App. 1997).

Appellant does not contend that the error in this case was constitutional in nature. Therefore, we consider the following factors to determine if he suffered any harm: (1) the

13

severity of the misconduct; (2) the measures adopted to cure the misconduct; and (3) the certainty of the conviction absent the misconduct. *Threadgill v. State*, 146 S.W.3d 654, 666–67 (Tex. Crim. App. 2004); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

When considering the severity of the prosecutor's misconduct, we must examine the prejudicial effect of his remarks. *Mosley*, 983 S.W.2d at 259. These remarks should be considered in light of the purpose of closing argument itself. As stated by the Court of Criminal Appeals, that purpose is "to facilitate the jury in properly analyzing the evidence presented at trial so that it may arrive at a just and reasonable conclusion based on the evidence alone, and not on any fact not admitted in evidence." *Campbell v. State*, 610 S.W.2d 754, 756 (Tex. Crim. App. [Panel Op.] 1980) (internal quotation omitted).

The prosecutor's argument did not advance a legitimate purpose in this case. It is true that the prosecutor laced his argument with many facts properly admitted into evidence, but commenting on the state of the evidence can be prejudicial when there is an implied or indirect allusion to issues that may not be discussed. *Cf. Myers v. State*, 573 S.W.2d 19, 20–21 (Tex. Crim. App. [Panel Op.] 1978) (holding that prosecutor's argument that there has been no explanation for why a person would possess so much marijuana was an impermissible critique on the defendants' failure to testify). The prosecutor here was not merely arguing that appellant was dishonest. The crux of his argument was that a defense attorney in a hypothetical trial would also argue that appellant was dishonest, and as a result, some prosecutions might not be feasible or successful. By focusing on the possible consequences of an acquittal, the argument served only to incite a fear that future criminals might escape conviction because of appellant's questionable credibility.

The prosecutor's misconduct may not have been as severe or troubling as if he had openly commented on appellant's right not to testify, but it was nonetheless prejudicial. Convictions cannot be had on the invention or fabrication of evidence. Inviting speculation into future events—including the fates of untried criminals—could only propel the jury

further in the direction of finding guilt. *See Berryhill,* 501 S.W.2d at 87 ("[I]nviting speculation is even more dangerous [than injecting matters not in the record] because it leaves to the imagination of each juror whatever extraneous 'facts' may be needed to support a conviction."). This first factor accordingly weighs in favor of finding harm.

Under the second factor, we consider the efficacy of any cautionary instruction from the trial judge. *Mosley*, 983 S.W.2d at 259. As already noted, defense counsel objected several times during the prosecutor's closing argument. The trial court sustained only one objection, which followed the prosecutor's hypothesizing a "man who beats his wife until she is purple." No instruction to disregard was requested at that point, and none was given *sua sponte*. All other objections were expressly overruled. When a trial court overrules an objection to an improper argument, it implicitly places its imprimatur on the argument, thereby magnifying the harm. *See Good v. State*, 723 S.W.2d 734, 738 (Tex. Crim. App. 1986); *Mayberry v. State*, 830 S.W.2d 176, 179 (Tex. App.—Dallas 1992, pet. ref'd). Because there were no curative instructions, this factor would also weigh in appellant's favor.

The third factor focuses on the strength of the evidence supporting the conviction. *Mosley*, 983 S.W.2d at 259. Appellant contends that the certainty of his conviction is questionable on the weapon charge. We agree.

Based on the charge given in this case, to obtain a conviction for unlawfully carrying a weapon, the State was required to prove that appellant intentionally or knowingly carried on or about his person a handgun in a motor vehicle at a time either when the handgun was in plain view or when appellant was engaged in criminal activity. *See* Tex. Penal Code § 46.02(a-1). The evidence does not establish that appellant was engaged in criminal activity at the time he encountered Troopers Crain and Hunt. Indeed, Trooper Hunt testified at trial that appellant did not appear to be doing anything to indicate a violation of the law. Therefore, if the jury were to convict appellant, there must have been a finding regarding the handgun's being in plain view.

15

Carrying a handgun in a motor vehicle is not criminal by nature. The conduct is criminalized by statute only when the handgun is displayed in plain view. Because a culpable mental state must apply to this surrounding circumstance, the State was required to prove that appellant knew the handgun was in plain view. *Cf. McQueen v. State*, 781 S.W.2d 600, 603–04 (Tex. Crim. App. 1989) (holding that statute criminalizing the unauthorized use of a motor vehicle requires proof that the accused knew his use to be unauthorized). From a sufficiency standpoint, a jury could have inferred appellant's knowledge of this fact from Trooper Crain's personal observation of the weapon. This finding was far from "certain," however.

The evidence showed that the weapon was partially covered by appellant's backpack. Photos taken from the encounter confirm that only a portion of the gun's handle could be seen from a regular vantage point. Around the weapon lie several sheets of paper, a police radio scanner, and a water bottle, all of which distract from the gun's visibility. Moreover, video captured from the scene shows that Trooper Hunt could not readily locate the handgun after being informed of its presence from Trooper Crain. Trooper Hunt also testified at trial that appellant appeared "a little bit surprised or upset that the gun was visible." From this evidence, the jury could have reasonably determined that appellant had attempted to conceal the weapon and was unaware that it could still be seen. Absent the prejudice from an improper argument, we cannot say that appellant's conviction on the weapon charge was in any way certain.

Appellant concedes that the evidence is stronger regarding the Private Security Act violation. We agree. No one disputes that appellant lacked a security services contractor license, and the record is replete with evidence that he engaged in a regulated service. He issued citations to apartment residents, responded to calls and disturbances, and notified police when situations escalated. Reissig testified that he assisted her with patrolling the property, both for her personal safety and to have a witness in case of trouble. Appellant identified himself as an officer. He distributed business cards claiming to be the chief of a

16

security agency. He wore a uniform and a gold badge around his neck. Appellant argues that his conviction was not certain, though, because the evidence also showed that appellant would never do anything to jeopardize his career goals. The issue is not whether appellant knew or intended that his actions would place his prospects at risk. Rather, the issue is whether he intended to perform the services of a guard company without a license, and the evidence leaves little doubt as to that. On this particular charge, the third factor weighs heavily in favor of finding harmless error.

To recap, all three factors weigh in appellant's favor when we examine just his conviction on the weapon charge: the prosecutor's argument was prejudicial because it encouraged the jury to "imagine" whatever facts may be needed to ensure that future and unrelated prosecutions are successful; the trial court magnified this harm by overruling appellant's objections, thereby giving its stamp of approval to the prosecutor's remarks; and the State's evidence that appellant knew his weapon to be in plain view was less than conclusive. The trial court should have sustained appellant's objections, and we conclude that its failure to do so was harmful.[1]

When we consider appellant's other conviction on the Private Security Act, only two of the three factors seem to compel a finding of harm. We are mindful, however, that the factors adopted by the Court of Criminal Appeals are merely factors, and each will apply with different weight according to the circumstances of individual cases. *See, e.g.*, *Mosley*, 983 S.W.2d at 260 (observing that prejudice was "relatively small" and the

---

[1] In making this conclusion, we wish to clarify that our determination of harm is based only on those claimed errors properly preserved. Appellant did not object to the prosecutor's final remarks about letting "bad guys walk away." We have quoted these remarks in the background section of this opinion to provide additional context into the prosecutor's preceding statements because they confirm his improper implications. We do not factor the impropriety of this final passage into our analysis, however. *See Threadgill v. State*, 146 S.W.3d 654, 667 (Tex. Crim. App. 2004) (holding that error was not preserved where appellant failed to object to prosecutor's argument that seemed to strike him over the shoulders of counsel). Similarly, we do not factor into our determination of harm the trial court's failure *sua sponte* to instruct the jury to disregard the prosecutor's statements after sustaining an objection to the remarks about "a man who beats his wife until she is purple." The errors we sustain relate only to those objections the trial court overruled.

certainty of conviction "heavily in favor of the State"). In this case the trial court clearly erred by failing to sustain appellant's objections, but the evidence of appellant's guilt was also overwhelming. Viewed in light of the record as a whole, this third factor outweighs the others. We cannot say that the trial court's error had any prejudicial effect on the outcome of appellant's being convicted of acting as a guard company without a license.

We sustain appellant's first issue only to the extent it relates to his conviction on his second charged count.

## CROSS-EXAMINATION

In his second issue, appellant contends he was denied the right of presenting a defense because the trial court restricted the scope of defense counsel's cross-examination. Appellant specifically complains about the trial court's ruling prohibiting defense counsel from questioning one of the troopers about the voluntariness of appellant's recorded statements.

Appellant filed a motion to suppress shortly after his arrest. In a hearing on that motion, appellant argued that his recorded statements were involuntary because the troopers used improper persuasion techniques during their interview. Only appellant and Trooper Hunt testified during the pretrial hearing. After reviewing the tape and the witness testimony, the trial court found "nothing in the questioning by the troopers as being coercive or threatening." The court clarified further that "[b]oth sides seem to be engaging in conversation. There was nothing on the demeanor of either part that was of concern to the Court."

During trial, defense counsel attempted to retry the issue of voluntariness during his cross-examination of Trooper Crain. The exchange proceeded as follows:

Q. Were you interviewing Mr. Watts to get information or were you interrogating him to get him to incriminate himself?

THE STATE: Objection, Judge.

18

THE COURT: Sustained.

Q. Earlier you said that you were interviewing him, right?

A. Yes.

THE STATE: Objection, Judge, repetitive.

THE COURT: Sustained.

Q. At the conclusion of all of these questions, were you trying to get him to incriminate himself?

THE STATE: Objection, Judge —

THE COURT: Sustained.

Q. Were you trying to persuade him to admit that he committed a crime?

THE STATE: Objection, Judge.

THE COURT: Sustained.

Q. Were you trying to compel him in some way —

THE STATE: Objection —

THE COURT: Counsel, I have ruled on this line of questioning, so move on. I think it has already been covered.

DEFENSE: Your Honor, I'm trying to track the statute, if I may.

THE COURT: I suggest you move on. I have ruled.

Q. Did you use persuasion techniques that you had learned —

THE STATE: Objection, Judge, repetitive.

THE COURT: This has been asked and answered, too.

DEFENSE: Your Honor, may I —

THE COURT: Counsel, move on.

DEFENSE: — briefly complete this line.

19

THE COURT:　　　No. It's time to move on. Let's move on.

Q.　　Mr. Watts was not free to leave after you detained him, right?

THE STATE:　　　Objection, Judge, asked and answered.

THE COURT:　　　Sustained.

Q.　　You kept —

THE COURT:　　　Counsel, wait. Stop. [Counsel], if you have any new questions to ask this witness, I suggest you ask them. Otherwise, I am considering you passing the witness to the State for redirect, if any. If you have no new questions to ask him, then fine. I'm going to pass him back to the State for any redirect. If you have new questions —

DEFENSE:　　　Yes, ma'am.

THE COURT:　　　— about new issues to ask him, then I suggest you ask him before I pass him back to the State.

DEFENSE:　　　Yes, Your Honor. I have just a few more questions about the issue of this statement.

THE COURT:　　　New questions that are not rephrasing of questions previously asked.

Q.　　Trooper Crain, you did not testify at a previous hearing on August 30th [regarding appellant's motion to suppress], correct?

THE COURT:　　　And that doesn't matter —

THE STATE:　　　Objection —

THE COURT:　　　— because he wasn't here. I mean it doesn't matter. Anything I did under a legal ruling —

DEFENSE:　　　Excuse me, Your Honor.

THE COURT:　　　— is not relevant to this jury.

DEFENSE:　　　Excuse me, Your Honor.

20

| THE COURT: | Okay. So, sit down and ask your next question. But anything I do — I am the legal Judge here, they're the fact judges, and they would like to hear facts, so move on. |
| --- | --- |
| DEFENSE: | Yes, ma'am. |

Q.  And you were the primary investigator in this case, right?

A.  Yes, sir.

Q.  This is the first time you've testified about the taking of the audio/video recording, right?

A.  Correct.

Q.  And I simply want to know did you use persuasion to get Mr. Watts to answer your questions?

| THE STATE: | Objection, Your Honor, asked and answered. |
| --- | --- |
| THE COURT: | Sustained. The Court has ruled on the admissibility of the videotape. It is in evidence. There is nothing else to challenge on it. You can handle that on appeal, if any. |
| DEFENSE: | To which we respectfully object, Your Honor. |
| THE COURT: | That is fine. Your objection is noted. I have ruled. It is admitted; and the jury will consider it for whatever purpose, if any, they so choose. |
| DEFENSE: | Your Honor, we're attempting to develop the jury charge as a matter of law. |
| THE COURT: | I develop the jury charge, and I know what the law is. And, Counsel, I would move on before we take another break. |

Defense counsel passed the witness without any further questioning.

Appellant challenges the trial court's ruling, arguing that defense counsel sought to elicit relevant testimony not prohibited by an established evidentiary rule. Although

21

appellant briefs this issue with a focus on his constitutional right to cross-examination, we interpret his complaint as alleged error in the exclusion of evidence. *See Love v. State*, 861 S.W.2d 899, 903 (Tex. Crim. App. 1993) (interpreting complaint that trial court refused to allow defense counsel to recall witness for further cross-examination as being predicated on exclusion of evidence). The State responds to this issue by countering that error was not preserved because appellant failed to make an offer of proof. We agree with the State.

In order to preserve error regarding a trial court's decision to exclude evidence, the complaining party must comply with Rule 103 of the Texas Rules of Evidence by making an "offer of proof" which sets forth the substance of the proffered evidence. *Mays v. State*, 285 S.W.3d 884, 889 (Tex. Crim. App. 2009). The offer of proof may consist of a concise statement by counsel, or it may be in question and answer form. *Id.* If in the form of a statement, the proffer "must include a reasonably specific summary of the evidence offered and must state the relevance of the evidence unless the relevance is apparent, so that the court can determine whether the evidence is relevant and admissible." *Id.* at 889–90 (quoting *Warner v. State*, 969 S.W.2d 1, 2 (Tex. Crim. App. 1998) (per curiam)).

Counsel did not proffer a concise statement of the evidence he sought, and it is not apparent from the context that Trooper Crain would have admitted to using impermissible persuasion techniques. Without an offer of proof, we decline to speculate about the nature of the trooper's excluded testimony.

Appellant's second issue is overruled.

## VOLUNTARINESS INSTRUCTION

In his third issue, appellant argues that the trial court erred by refusing his request for a voluntariness instruction.

Appellant's recorded statements were published at trial for the jury's consideration. Pursuant to article 38.22, section 6 of the Texas Code of Criminal Procedure, defense counsel attempted to develop the issue of voluntariness during his cross-examination of

Trooper Crain. As previously discussed, the trial court prohibited counsel from pursuing that line of questioning. Counsel later requested a voluntariness instruction during the charge conference; that request was denied.

The trial court has an absolute duty *sua sponte* to prepare a jury charge that accurately sets out the law applicable to the case. Tex. Code Crim. Proc. art. 36.14 (West 2012); *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007). The "law applicable to the case" includes any instruction, such as that contained under article 38.22, that is required when particular circumstances are met.

Article 38.22, section 6, which governs the admissibility of custodial and non-custodial statements, provides that only voluntary statements may be admitted at trial. Tex. Code Crim. Proc. art. 38.22, § 6. An accused may claim that a statement was procured involuntarily under the statute for reasons including police overreaching, youth, intoxication, illness or medication, mental incapacitation, or other disabilities. *Oursbourn*, 259 S.W.3d at 172–73. Although these factual scenarios are usually not enough by themselves to render a statement inadmissible, they are factors a jury is entitled to consider when furnished with a proper instruction. *Id.* at 173.

An instruction under article 38.22, section 6 becomes the "law applicable to the case" only if the parties actually litigate the issue of voluntariness. *Id.* at 175. This ensures that the trial judge is on notice that an instruction may be required. *Id.* at 176. A question is raised with respect to article 38.22 when a party notifies the trial judge of the issue or when the trial judge raises the issue on her own. *Id.* at 175.

For the instruction to be warranted, the record must also contain some evidence presented at trial that would permit a reasonable jury to conclude that the statement was not voluntary. Appellant failed to produce any evidence here. He did not testify before the jury that his statements were involuntarily procured, and there was no testimony from any other witness tending to show that his statements were obtained by compulsion or persuasion. Defense counsel's unanswered questions to Trooper Crain constitute no evidence on this

23

subject. *See Kercho v. State*, 948 S.W.2d 34, 37 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd) ("Questions do not amount to evidence."). Without any evidence that the statements were made involuntarily, we cannot say that article 38.22 ever became the law applicable to the case. Therefore, the trial court was not required to submit the instruction to the jury. *White v. State*, 779 S.W.2d 809, 827 (Tex. Crim. App. 1989); *Morales v. State*, — S.W.3d —, No. 14-10-01082-CR, 2012 WL 1406458, at *4–10 (Tex. App.—Houston [14th Dist.] Apr. 24, 2012, no pet. h.).

Appellant's third issue is overruled.

## CONCLUSION

The trial court's judgment in cause number 1666129, for acting as a guard company without a license, is affirmed. The judgment in cause number 1693626, pertaining to appellant's conviction for unlawfully carrying a weapon, is reversed and remanded for new trial.

/s/    Adele Hedges
Chief Justice

Panel consists of Chief Justice Hedges and Justices Jamison and McCally.

Publish — Tex. R. App. P. 47.2(b).