Opinion issued January 23, 2018



In The

# Court of Appeals

For The

## First District of Texas

———————————

## NO. 01-16-00434-CR

———————————

## DAMON ORLANDO MILTON, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

### On Appeal from the 338th District Court
### Harris County, Texas
### Trial Court Case No. 1472750

---

### OPINION DISSENTING FROM DENIAL OF EN BANC RECONSIDERATION

[A]rguments which de-humanize an accused do not aid jurors in their task; rather, they discredit a criminal justice system founded on the basic beliefs that an accused stands before a jury as an equal peer and that the State's prosecutors seek as their first goal justice, not

convictions at any cost. . . . [W]hen arguments degrade to likening litigants to animals, it is appropriate for the . . . court to . . . intervene.[1]

A jury found appellant, Damon Orlando Milton, guilty of the offense of robbery.[2] After finding true the allegations in two enhancement paragraphs that he had twice been previously convicted of felony offenses, the jury assessed his punishment at confinement for fifty years. In his first issue, appellant contends that the trial court erred in overruling his objection, made at the punishment phase of trial, to the portion of the State's closing argument during which it played a videotape recording titled, "Lion tries to eat baby PART 1" (the "lion-tries-to-eat-baby video"),[3] which contains the following two still frames:

---

[1]   *Alexander v. State*, No. 04-95-00154-CR, 1996 WL 382984, at *4 (Tex. App.—San Antonio July 10, 1996, pet. ref'd) (not designated for publication).

[2]   *See* TEX. PENAL CODE ANN. § 29.02(a)(2) (Vernon 2011).

[3]   A copy of the videotape recording appears in the record but may also be found on YouTube. *See* Jpbsmama, *Lion tries to eat baby PART 1*, YOUTUBE (May 2, 2012), https://www.youtube.com/watch?v=6fbahS7VSFs.

 

Because the panel errs in holding that the trial court did not err in overruling appellant's objection, I respectfully dissent from the Court's order denying en banc reconsideration in this case. *See* TEX. R. APP. P. 41.2(c).

## Background

The complainant, LaSondra Robertson, testified that she previously worked as a store clerk and cashier at a CVS Pharmacy located in Harris County, Texas. On June 22, 2015, appellant came into the store and looked around for about ten or fifteen minutes. While appellant walked around the store, he behaved like "any other customer," and the complainant was not alarmed or afraid. Appellant, after

3

apparently waiting for "no one else [to be] around," approached the complainant and placed several inexpensive "food items"[4] on the counter. Again, she was not afraid of appellant nor alarmed by his actions. As the complainant began to scan the items that appellant had placed on the counter, he "leaned over" and told her, "[T]his is a stick up, give me whatever is in the [cash] register, do not try anything, or I will kill you." Although appellant had told the complainant that he had a weapon, she did not see one. She then felt nervous and scared, and she gave him "the money out of the register." Appellant picked up the "food items" that he had previously placed on the counter and grabbed "four beers," "a bag of Starburst[s]," and "some chips" before walking out of the store.

The complainant explained that during the entire time that appellant stood at the counter with her, his hands stayed on the counter within her sight. He did not have a weapon in his hands, did not "mess[] with [the] waistband" of his pants, and did not place a weapon on the counter. He also did not touch her or cause her to sustain any scratches, bruises, or any bodily injury. The complainant did not know how much money appellant had taken from the cash register, but the only dollar bills in the register were in denominations of twenty dollars or less. She also explained that she did not tell any of the law enforcement officers, who arrived at the scene after the robbery, that appellant had told her he was going to "kill" her. The first

---

[4] The complainant noted that the "food items" consisted of candy and a soda.

time that she had ever stated that appellant threatened to kill her was in her trial testimony.

Houston Police Department ("HPD") Officer C. Inocencio testified that following the incident, appellant was found to be in possession of a CVS Pharmacy bag, "some kind of food products," "cash money," "rolled coins," and "assorted [loose] change." The "food products" found in appellant's possession had a total value of $17.53. Inocencio explained that the complainant never reported that appellant had threatened to "kill her."

HPD Officer A. Huckabee testified that when he detained appellant shortly after he had left the CVS Pharmacy, he did not have in his possession a firearm, a knife, or any type of weapon.[5] And appellant fully cooperated with law enforcement officers.

At the punishment phase of trial, the trial court admitted evidence of appellant's criminal record, revealing that on August 17, 1993, he was convicted of two separate offenses of robbery[6] and sentenced to confinement for seven years for each offense, to run concurrently; on September 26, 1994, he was convicted of the

---

[5] HPD Officer P. Pac similarly testified during the punishment phase of trial that appellant was not in possession of a weapon when he was detained by law enforcement officers.

[6] *See* TEX. PENAL CODE ANN. § 29.02(a).

offense of theft[7] and sentenced to confinement for fourteen years; on August 27, 2002, he was convicted of the offense of evading arrest[8] and sentenced to confinement for ten months; on May 31, 2007, he was convicted of the misdemeanor offense of attempted unauthorized use of a motor vehicle[9] and sentenced to confinement for eight months; and on January 22, 2013, he was convicted of the offense of forgery[10] and sentenced to confinement for ten months.

During its closing argument at the punishment phase of trial, the State, after playing the lion-tries-to-eat-baby video for the jury, stated:

> *[T]hat 30-second clip is exactly what this punishment phase is about.* . . .
>
> . . . I'm asking you to start at 40 [years]. I'm not ashamed to ask you that, I'm not hesitant to ask for that. Start at 40 [years], consider the range of punishment.
>
> . . . .
>
> I'm not an expert on human behavior, and probably there are a couple on the panel more qualified to talk about this than I am. But I believe in the simplest form, human behavior is motive, plus opportunity, and that equals behavior. . . .
>
> Let me talk to you about that video. That lion was cute, and it was laughable, and it was funny because he's behind that piece of glass. That motive of that lion is never changing, never changing. It's enate. *Given the opportunity, remove that glass, it's no[] longer funny, it's a*

---

[7]  *See id.* § 31.03(a) (Vernon Supp. 2016).

[8]  *See id.* § 38.04(a) (Vernon 2016).

[9]  *See id.* § 15.01(a) (Vernon 2011), § 31.07(a) (Vernon 2016).

[10]  *See id.* § 32.21(b) (Vernon 2016).

*tragedy. That's what's going to happen, that's a tragedy. That's what [is] going on with this case.*

. . . .

. . . In a vacuum, that resume right there, a sterile courtroom, it's almost laughable because *we know [appellant]'s such a bad guy*. It's almost laughable, *just like that lion*. You're laughing at that lion because he's behind that piece of glass. *Nothing funny about that lion when he's outside that piece of glass, that's a tragedy. Nothing funny when [appellant] is outside of prison, that's a tragedy. That's what I meant when I said that video has everything to do with this case, because he's never changing his motive.*

Remember the good old days? Everybody here is over 20 years old and used to talk about the good old days, how everyone played outside until it was dark, and then kids came home for dinner. And I never even had to lock my house, my neighbors would just come and go. *[Appellant] is why we don't have the good old days. He's the reason you lock[ed] your house when you left, he's the reason you locked your car when you came to court today, [appellant] is the reason we don't have the good old days.*

. . . .

. . . I'm not going to thank you for your verdict that you return on punishment. Because quite frankly, I'm envious of your position. Every one [of] you can go home tonight and turn on the news, and you're going to see the nightly news, and say, man, our city has really gotten violent. I wish somebody would do something about that.

. . . .

Man, I wish I could do something about that. . . . You, 12, have the opportunity to when you turn on that news, say, man, it's gotten bad, but I finally did something about it. . . .

This isn't a 25-year case, this isn't a 35-year case, maybe it's a 40-year case. The Legislator [sic] said two convictions, 25, that's where you start. When you've got five and another one reduced, *quit giving him*

*chances, quit removing that glass. Keep that glass there, remove the opportunity, and send him to prison for every second that he deserves. He surely doesn't deserve less than 40.*

(Emphasis added.)

## Improper Argument

In his first issue, appellant argues that the trial court erred in overruling his objection to the portion of the State's closing argument at the punishment phase of trial during which it played the lion-tries-to-eat-baby video for the jury because the video was "not admitted into evidence during . . . trial"; was not relevant; "portrayed images that were highly prejudicial and inflammatory"; "suggested a punishment on an improper basis"; and "compare[d] [a]ppellant's presence out of prison to that of a lion that would be mauling an infant but for a piece of glass." And he asserts that the State's misconduct in playing the video affected his substantial rights.

The law provides for, and presumes, a fair trial free from improper argument by the State. *Long v. State*, 823 S.W.2d 259, 267 (Tex. Crim. App. 1991); *Thompson v. State*, 89 S.W.3d 843, 850 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). The Court reviews a trial court's ruling on an objection to improper jury argument for an abuse of discretion. *Garcia v. State*, 126 S.W.3d 921, 924 (Tex. Crim. App. 2004). Although the State is afforded wide latitude in its jury arguments, proper jury argument is generally limited to: (1) summation of the evidence presented at trial; (2) reasonable deductions drawn from that evidence; (3) answers to opposing

8

counsel's argument; and (4) pleas for law enforcement. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000); *Acosta v. State*, 411 S.W.3d 76, 93 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

It has long been established that the State cannot use its closing argument to place matters before the jury that are outside the record and prejudicial to the accused. *Everett v. State*, 707 S.W.2d 638, 641 (Tex. Crim. App. 1986); *Thompson*, 89 S.W.3d at 850. Arguments referencing matters that are not in evidence and may not be inferred from the evidence are usually "designed to arouse the passion and prejudices of the jury and as such are highly inappropriate." *Borjan v. State*, 787 S.W.2d 53, 57 (Tex. Crim. App. 1990); *Thompson*, 89 S.W.3d at 850. The purpose of closing argument is "to facilitate the jury in properly analyzing the evidence presented at trial so that it may arrive at a just and reasonable conclusion based on the evidence alone, and not on any fact not admitted in evidence." *Campbell v. State*, 610 S.W.2d 754, 756 (Tex. Crim. App. [Panel Op.] 1980) (internal quotations omitted).

Here, the panel held that the trial court did not err in overruling appellant's objection to the State's playing of the lion-tries-to-eat-baby video for the jury because the video was played in "response to the theme of appellant's closing argument" and constituted a plea for law enforcement. In doing so, the panel relied exclusively on this Court's prior decision in *Thompson v. State*, No.

9

01-14-00862-CR, 2015 WL 9241691 (Tex. App.—Houston [1st Dist.] Dec. 17, 2015, no pet.) (mem. op., not designated for publication). *See* TEX. R. APP. P. 47.7(a).

In *Thompson*, the defendant and the complainant, a fifteen-year-old boy, confronted each other at an apartment complex. 2015 WL 9241691, at *1. As the defendant approached the complainant, he showed the complainant a firearm tucked into his pants. *Id.* The complainant then told the defendant that he was not "worried" about the firearm because he had a firearm as well. *Id.* (internal quotations omitted). A verbal confrontation ensued, and when it escalated, the complainant turned to run away. *Id.* The defendant then shot the complainant as he was running away, resulting in the complainant's death. *Id.*

After the jury found the defendant guilty of murder, the State, during its closing argument in the punishment phase of trial, referenced the same lion-tries-to-eat-baby video at issue in the instant case. *Id.* at *1–2. Specifically, the State, over the defendant's objection, argued:

> I don't know if any of you saw that[;] it was in a video back on CNN . . . where it was a mother, who had her little baby, and she was holding—she was at the zoo—and she [was] holding this baby near the lion cage. And there was a clear plastic barrier between the baby and the lion, and the baby is sitting there dancing, moving around, and the lion comes out. It's gnawing right there. Everybody thinks, oh, it's hilarious. It's cute. It's so great [the] mom's filming it, sends it to CNN, everybody watches it. But was that really cute? What would have happened if the glass barrier was not there? That baby is a goner.

10

Because the motivation of a lion, a lion is a killer. A lion is a predator. That lion would have eaten that baby and nothing would have changed.

The [d]efendant is a killer. He is a predator.

. . . .

. . . Do we want to remove that clear plastic barrier between the lion and the baby? Do we want to do that?

. . . .

. . . That's your decision. You get to decide because he'll get out eventually. He will. You get to decide when you feel comfortable having this predator, this killer back with our families on our streets.

For the sake of all of us, for the sake of your community, I ask that you send him away for as long as you feel comfortable with. I ask that [it] be a long time. I ask that you refer to either the first or second page of your verdict sheets, and you give him a number of years that you feel comfortable telling your family that you kept a murderer out of our waters.

*Id.* at *1–2 (first, second, third, and tenth alterations in original). The jury then sentenced the defendant to confinement for thirty years. *Id.* at *1.

On appeal, the defendant asserted that the trial court had erred in overruling his objection to the State's closing argument to the jury, particularly the State's reference to the lion-tries-to-eat-baby video. *Id.* at *2. This Court, however, noting the particularly gruesome nature of the crime, i.e., the murder of a fifteen-year-old boy as he was fleeing, held that the trial court did not err because the State's argument, including its "use of the analogy of [the defendant] as a lion that must remain caged," constituted a proper plea for law enforcement given "the context of

11

th[e] case." *Id.* at *3. Notably, in reaching its holding, the Court looked to other cases, which had also held that the reference to a defendant as "an animal" was not improper because of the extremely violent and gruesome nature of the criminal offenses that had been committed. *See id.* (citing *Burns v. State*, 556 S.W.2d 270, 285 (Tex. Crim. App. 1977) (holding reference to defendant as animal not improper where defendant brutally tortured and murdered fifty-eight-year-old man); *Belton v. State*, 900 S.W.2d 886, 898–99 (Tex. App.—El Paso 1995, pet. ref'd) (reference to defendant as animal not improper where defendant broke into family's home, terrorized them, shot mother and two children, and killed one child)); *but see Rangel v. State*, No. 01-92-01128-CR, 1994 WL 362796, at *5 (Tex. App.—Houston [1st Dist.] July 14, 1994, pet. ref'd) (not designated for publication) (State's calling defendant "an animal and a creep" improper (internal quotations omitted)).

The problem with the panel's reliance on *Thompson*, and the cases cited in *Thompson* which involve seriously violent criminal offenses, is that, here, the Court is not faced with a gruesome or incredibly violent criminal offense. *See Thompson*, 2015 WL 9241691 at *1 (murder of child fleeing scene); *see also Burns*, 556 S.W.2d at 273, 280–81 (beating, torturing, murder, and rape of elderly man); *Belton*, 900

12

S.W.2d at 898 (robbery of family home and murder of child in front of mother and siblings).[11]

When appellant came into the CVS Pharmacy where the complainant was working, she was not afraid of him nor alarmed by his actions, as appellant behaved like "any other customer." After being in the store for about ten or fifteen minutes, appellant, who had apparently waited for "no one else [to be] around," then approached the complainant, placing several inexpensive "food items" on the counter. Again, she was not afraid of appellant nor alarmed by his actions. After

---

[11]    In *Burns v. State*, the defendant and another man drove the complainant, a fifty-eight-year-old man, to "a caliche pit" where they took his money, clothes, boots, watch, and false teeth. 556 S.W.2d 270, 273, 280 (Tex. Crim. App. 1977). They then beat the complainant, the other man "screwed [the complainant] in the ass," and they left him in the pit, naked except for socks. *Id.* at 280 (internal quotations omitted). When the defendant and the other man later returned to the pit, the complainant "looked like he was almost dead[,] his face was black and blue and bloody," and his jawbone was broken. *Id.* at 280–81 (internal quotations omitted). They then put the complainant on the hood of their car and continued to beat him, including kicking him in the head. *Id.* at 281. When the complainant fell to the ground, the defendant picked him up, put him back on the car, and continued to beat him. *Id.* at 273, 281. They then grabbed the complainant by each leg and pulled him off the car "real fast," "let[ting] him fall to the ground." *Id.* at 281 (internal quotations omitted). The defendant "gigg[led]," "act[ed] like [what he was doing] was fun," and thought what he had done was "funny." *Id.* at 280–81 (internal quotations omitted). One witness also testified that the defendant and the other man made the complainant eat his own feces. *Id.* at 281.

In *Belton v. State*, the defendant and another man, carrying firearms, broke into a family's home where a mother and her three children were present. 900 S.W.2d 886, 892 (Tex. App.—El Paso 1995, pet. ref'd). The defendant used his firearm to beat one of the children in the head. *Id.* After rampaging through the family's home, the defendant and the other man shot the mother and two of the children, ultimately killing one of the children in the presence of his mother and siblings. *Id.*

the complainant scanned the items that appellant had placed on the counter, he "leaned over" and told her that he had a weapon and to give him the money in the cash register. The complainant, however, never saw a weapon. And she noted that appellant's hands remained on the counter within her sight the entire time, he did not "mess[] with [the] waistband" of his pants, and he did not place a weapon on the counter. He did not touch the complainant or cause her to sustain any scratches, bruises, or bodily injury. After the complainant gave appellant the money from the cash register, he picked up the "food items" that he had previously placed on the counter and grabbed "four beers," "a bag of Starburst[s]," and "some chips" before walking out of the store. The complainant did not know how much money appellant had taken from the cash register, but the only dollar bills in the cash register were in denominations of twenty dollars or less. The "food items" taken by appellant had a total value of $17.53. When appellant was later detained by law enforcement officers shortly after leaving the CVS Pharmacy, he did not have in his possession a firearm, a knife, or any type of weapon. And he fully cooperated with law enforcement officers.

A surveillance videotape recording from the date of the offense, admitted into evidence as State's Exhibit 6, shows appellant calmly walking up to the counter at the CVS Pharmacy. No other customers are present when appellant approaches the counter. After the complainant scans several items that appellant places on the

14

counter, he calmly leans forward and says something to her. What he says to her cannot be heard on the videotape recording, but he does not make any threatening or violent gestures. And he does not touch the complainant. Appellant's hands remain on the counter throughout the entire incident. After the complainant gives appellant the money from the cash register, he walks off-screen and then is seen calmly walking out of the store.

The panel in its opinion does note the difference between the circumstances of the present case and those present in *Thompson* and "other cases permitting comparisons of defendants to predatory animals," particularly because such cases have involved murder "or other violent behavior."[12] And the panel admits that "[t]he appropriateness of the [lion-tries-to-eat-baby video] analogy in this case is tenuous given the nature of the crime" committed by appellant. *See Alexander v. State*, No.

---

[12]    *See Burns*, 556 S.W.2d at 273, 280–81; *Thompson*, 2015 WL 9241691, at *1; *Belton*, 900 S.W.2d at 892; *see also Stringfellow v. State*, No. 05-02-00475-CR, 2003 WL 152760, at *3–4 (Tex. App.—Dallas Jan. 23, 2003, no pet.) (not designated for publication) (reference to defendant as "animal" reasonable deduction where he brutally attacked complainant, hit her, shoved her, ripped her clothes, forced her to perform oral sex, threatened to kill her, repeatedly raped her, and robbed her); *Resendez v. State*, No. 14-99-01374-CR, 2001 WL 777861, at *1– 3 (Tex. App.—Houston [14th Dist.] July 12, 2001, pet. ref'd) (not designated for publication) (reference to defendant as "animal" and "monster" reasonable deduction where defendant sexually molested and had sexual intercourse with complainant, a female relative, beginning when she was five or six years old and continuing over a period of years); *Navarro v. State*, No. 08-99-00214-CR, 2000 WL 1476638, at *8–9 (Tex. App.—El Paso Oct. 5, 2000, no pet.) (not designated for publication) (reference to defendant as "monster" reasonable deduction where defendant broke into home of pregnant woman, beat her "about the face, torso, and stomach, and then proceeded to rape her in front of her two children").

15

04-95-00154-CR, 1996 WL 382984, at *3–4 (Tex. App.—San Antonio July 10, 1996, pet. ref'd) (not designated for publication) (argument likening defendant to animal improper in case where defendant convicted of delivery of controlled substance); *cf. Stringfellow v. State*, No. 05-02-00475-CR, 2003 WL 152760, at *3–4 (Tex. App.—Dallas Jan. 23, 2003, no pet.) (not designated for publication) (only in cases involving "[p]articularly brutal facts" may there be "a reasonable deduction to justify a prosecutor's reference to a defendant as an animal"). Regardless, the panel reasons that because appellant had prior convictions, the trial court did not err in allowing the State to play the lion-tries-to-eat-baby video for the jury during its closing punishment argument.

Notably though, just as the criminal offense committed by appellant in the instant case is neither gruesome nor violent, rendering the State's playing of the lion-tries-to-eat-baby video improper, the criminal offenses of which appellant had previously been convicted are also of a non-violent nature.[13] Simply put, nothing in

---

[13]    The trial court admitted evidence of appellant's criminal record, revealing that on August 17, 1993, he was convicted of two separate offenses of robbery and sentenced to confinement seven years for each offense, to run concurrently; on September 26, 1994, he was convicted of the offense of theft  and sentenced to confinement for fourteen years; on August 27, 2002, he was convicted of the offense of evading arrest and sentenced to confinement for ten months; on May 31, 2007, he was convicted of the misdemeanor offense of attempted unauthorized use of a motor vehicle and sentenced to confinement for eight months; and on January 22, 2013, he was convicted of the offense of forgery  and sentenced to confinement for ten months.  *See* TEX. PENAL CODE ANN. §§ 15.01(a), 29.02(a), 31.03(a), 31.07(a), 32.21(b), 38.04(a).

appellant's prior criminal history warrants a comparison between him and a predatory animal attempting to eat an innocent baby.[14] *See Tompkins v. State*, 774 S.W.2d 195, 217 (Tex. Crim. App. 1987) (State's reference to defendant "as an animal" "served no legitimate purpose except to jeopardize the State's case on appeal" (internal quotations omitted)).

As the Texas Court of Criminal Appeals has previously explained in regard to the State's arguments to juries: "This Court should not have to point out that comments by the attorneys should always be confined to the record and the legitimate deductions from the testimony of the witnesses." *Id.* at 218. And "there is abundant room for legitimate discussion of the testimony [in the case] and the law applicable, without indulging in personal abuse of the man who is at the bar of justice." *Swilley v. State*, 25 S.W.2d 1098, 1099 (Tex. Crim. App. 1929). Notably, "[i]t takes far less talent to indulge in abuse than in making an intelligent assessment of the facts and the law to aid the jurors in their task." *Grant v. State*, 472 S.W.2d 531, 534 (Tex. Crim. App. 1971).

---

[14] Further, the request of appellant's attorney that the jury sentence appellant to "a lower sentence" does not justify the State's comparison of appellant to a predatory animal trying to eat an innocent baby.

Based on the foregoing, I would hold that the State's playing of the lion-tries-to-eat-baby video for the jury during its closing argument at the punishment phase of trial was improper.[15]

When an argument exceeds permissible bounds, it constitutes reversible error when an analysis of the record as a whole shows that the argument is extreme or manifestly improper, is violative of a mandatory statute, or injects new facts harmful to the defendant into the trial proceeding. *Wesbrook*, 29 S.W.3d at 115; *see also* TEX. R. APP. P. 44.2(b). An appellate court, in assessing the harm of an improper jury argument during the punishment phase of trial, looks to three factors: (1) severity of the misconduct (the magnitude of the prejudicial effect of the State's remarks); (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of the same punishment being assessed absent the misconduct (the strength of the evidence supporting the conviction). *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998); *see also* *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).

---

[15] Despite the panel's decision in the instant case, the State should refrain from using this lion-tries-to-eat-baby video in the future. *See Grant v. State*, 472 S.W.2d 531, 534 (Tex. Crim. App. 1971) ("It takes far less talent to indulge in abuse than in making an intelligent assessment of the facts and the law to aid the jurors in their task."); *Alexander*, 1996 WL 382984, at *4 ("[A]rguments which de-humanize an accused do not aid jurors in their task; rather, they discredit a criminal justice system founded on the basic beliefs that an accused stands before a jury as an equal peer and that the State's prosecutors seek as their first goal justice, not convictions at any cost.").

18

In regard to the first *Mosley* factor, the State's playing of the lion-tries-to-eat-baby video during its closing punishment argument was highly prejudicial. *See Hawkins*, 135 S.W.3d at 77–78 (when assessing severity of improper jury argument, primary focus is prejudicial effect of misconduct); *Watts v. State*, 371 S.W.3d 448, 459 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (must examine prejudicial effect of State's remarks). Here, after playing the video for the jury, the State told the jury that the video was "exactly what th[e] punishment phase [of appellant's trial was] about." The State then characterized appellant as "a bad guy" and compared him to the lion in the video; namely, a lion who was attempting to eat an innocent baby. The State further argued:

> . . . *Nothing funny about that lion when he's outside that piece of glass, that's a tragedy. Nothing funny when [appellant] is outside of prison, that's a tragedy. That's what I meant when I said that video has everything to do with this case, because he's never changing his motive.*

> Remember the good old days? Everybody here is over 20 years old and used to talk about the good old days, how everyone played outside until it was dark, and then kids came home for dinner. And I never even had to lock my house, my neighbors would just come and go. *[Appellant] is why we don't have the good old days. He's the reason you lock[ed] your house when you left, he's the reason you locked your car when you came to court today, [appellant] is the reason we don't have the good old days.*

> . . . .

> This isn't a 25-year case, this isn't a 35-year case, maybe it's a 40-year case. The Legislator [sic] said two convictions, 25, that's where you start. When you've got five and another one reduced, *quit giving him chances, quit removing that glass. Keep that glass there, remove the*

19

*opportunity, and send him to prison for every second that he deserves. He surely doesn't deserve less than 40.*

(Emphasis added.)

The State's comparison of appellant to a violent, predatory animal seeking to attack a defenseless baby was prejudicial, did not advance a legitimate purpose in this case, and was designed to arouse the passion and prejudices of the jury. *See Tompkins*, 774 S.W.2d at 217; *Watts*, 371 S.W.3d at 459; *Thompson*, 89 S.W.3d at 850. And the State played the lion-tries-to-eat-baby video during the rebuttal portion of its closing argument and immediately prior to the jury's deliberation. Thus, the harmful effect caused by the video could not have been attenuated by any argument of appellant's counsel. *See Brown v. State*, 978 S.W.2d 708, 715 (Tex. App.—Amarillo 1998, pet. ref'd); *see also Bush v. State*, No. 04-13-00466-CR, 2014 WL 309780, at *5 (Tex. App.—San Antonio Jan. 29, 2014, no pet.) (mem. op., not designated for publication). The severity of the misconduct in this case weighs in favor of appellant. *See Gonzalez v. State*, 455 S.W.3d 198, 206 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (first factor weighed in favor of defendant where State's action "clearly improper"); *cf. Graves v. State*, 176 S.W.3d 422, 430 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (first factor did not weigh in favor of defendant where State's misconduct "small" and only "mildly inappropriate" (internal quotations omitted)).

In regard to the second *Mosley* factor, no measures were taken to cure the State's misconduct. In fact, the trial court overruled appellant's objection to the State's playing of the lion-tries-to-eat-baby video to the jury. *See Good v. State*, 723 S.W.2d 734, 738 (Tex. Crim. App. 1986) (overruling objection to improper argument "puts the stamp of judicial approval on the improper argument" (internal quotations omitted)); *Watts*, 371 S.W.3d at 460 ("When a trial court overrules an objection to an improper argument, it implicitly places its imprimatur on the argument, thereby magnifying the harm."); *see also Sneed v. State*, No. 10-11-00231-CR, 2012 WL 2866304, at *3 (Tex. App.—Waco July 12, 2012, no pet.) (mem. op., not designated for publication) (trial court did not take "any curative measures" where it overruled defendant's objection to improper argument). Because no curative measures were taken in this case, the second factor weighs in favor of appellant. *See Watts*, 371 S.W.3d at 460.

In regard to the third *Mosley* factor, because the jury found true the allegations in the two enhancement paragraphs that appellant had twice been previously convicted of felony offenses, appellant was subject to the habitual offender punishment range of not less than twenty-five years and not greater than ninety-nine years or life. *See* TEX. PENAL CODE ANN. § 12.42(d) (Vernon Supp. 2016). The State argued to the jury that appellant should not receive "less than 40" years due to his predatory nature and the need for society to keep him behind "glass." And the

21

jury assessed appellant's punishment at confinement for fifty years. *See Abbott v. State*, 196 S.W.3d 334, 349 (Tex. App.—Waco 2006, pet. ref'd) (considering severity of defendant's sentence and jury's decision to assess severe sentence which State had requested); *cf. Lockett v. State*, No. 06-05-00138-CR, 2006 WL 940648, at \*7 (Tex. App.—Texarkana Apr. 13, 2006, pet. ref'd) (mem. op., not designated for publication) (improper jury argument did not affect defendant's substantial rights where jury assessed punishment at confinement "nearer the lower end of the punishment range"). Here, there is doubt that the same sentence would have been assessed had the trial court not overruled appellant's objection to the lion-tries-to-eat-baby video, especially considering that the circumstances of this case and appellant's prior criminal convictions do not show him to be a violent, predatory offender. *See Sneed*, 2012 WL 2866304, at \*4 (reversing judgment of trial court and remanding for new trial on punishment where "some doubt that the same sentence would have been assessed without the [trial court] overruling [defendant's] objection to the improper argument"). This third factor weighs in favor of appellant.

Balancing the three *Mosley* factors, due to the prejudice experienced by the State's playing of the lion-tries-to-eat-baby video during its closing punishment argument to the jury, the lack of cure for the State's misconduct, and the severity of appellant's sentence, I would further hold that the trial court's error in allowing the State to play the video to the jury was harmful.

22

Moreover, this Court's approval of the State's use of the lion-tries-to-eat-baby video in this case will no doubt encourage the State to improperly use it in other cases involving non-violent offenses. *See Alexander v. State*, No. 04-95-00154-CR, 1996 WL 382984, at *4 (Tex. App.—San Antonio July 10, 1996, pet. ref'd) (not designated for publication) ("[A]rguments which de-humanize an accused do not aid jurors in their task; rather, they discredit a criminal justice system founded on the basic beliefs that an accused stands before a jury as an equal peer and that the State's prosecutors seek as their first goal justice, not convictions at any cost."). Accordingly, I would grant en banc reconsideration, sustain appellant's first issue, reverse the trial court's judgment as to punishment, and remand for a new punishment hearing in this case. *See* TEX. R. APP. P. 41.2(c) (extraordinary circumstances require en banc reconsideration).

Terry Jennings
Justice

Panel consists of Chief Justice Radack and Justices Keyes and Massengale.

En banc reconsideration was requested. *See* TEX. R. APP. P. 49.7.

A majority of the justices of the Court voted to deny the motion for en banc reconsideration.

The en banc court consists of Chief Justice Radack and Justices Jennings, Keyes, Higley, Bland, Massengale, Brown, Lloyd, and Caughey.

23

Justice Jennings, dissenting from the denial of en banc reconsideration with separate opinion.

Justice Bland, dissenting from the denial of en banc reconsideration with separate opinion.

Publish. TEX. R. APP. P. 47.2(b).